† WEED *versus* SIBLEY.

When the defendant justifies his acts as being done in the performance of his duty in removing *obstructions* in the *highway,* which acts would otherwise be a trespass on the rights of the plaintiff, the burden of proof is on him to show that the highway, where the acts were done, was built upon its location.

ON REPORT from *Nisi Prius,* TENNEY, J., presiding.
TRESPASS *quare clausum.*

A road leading from Knox corner to Freedom village had been made and traveled by the public for many years. As

part of this road the town of Freedom had built a bridge over Sandy stream.

After the bridge had been so built, kept in repair, and used as a public highway for eighteen years, the plaintiff fenced it up and obstructed the public travel. This obstruction was removed by defendant, as a selectman of Freedom. For that act, this suit was commenced.

The defendant justified on the ground of his duty to keep open one of the highways.

The question involved was, whether the bridge was constructed within the limits of the location of the County Commissioners.

, Upon all the evidence in the case, which was voluminous, the Court were authorized to draw inferences as a jury might, and render such judgment as the law governing the case required.

*N. Abbot,* for plaintiff.

*Heath,* for defendant.

TENNEY, J.—As early as 1831, the late Court of Sessions for the county of Waldo, as appears by its records, laid out a highway from a place in the town of Knox, called Sawyer's or Knox corner, to a point in Freedom, near the dwellinghouse of the late Dr. Bellows, deceased, crossing Sandy stream, near the village in the town of Freedom; the last portion of this highway, on the western side of the stream, was through a ravine bounded each side by high bluffs. This way on the eastern side of the stream, was partially staked out; and the butment for the bridge across the stream was in part or wholly built; but the road was never completed. On the petition of Jeremiah Curtis and others, at the April term, 1833, of the County Commissioners, who had then succeeded the Court of Sessions, a part of the highway referred to, was discontinued, and one described as follows, substituted therefor, as appears by the records of that Court:—Beginning at a stake marked 'R' on the easterly side of the road as formerly established, on

the line between James Clement's and Henry Dodge's land, thence running south 62¼ degrees east forty-one rods, to a white maple bush marked 'R,' on the easterly side of the road leading from Freedom to Unity, over lands belonging to Henry Dodge and Thomas Pickard, to be four rods wide, and to be on the westerly side of said line." The way thus laid out by the County Commissioners, and that part of the road from Freedom to Unity referred to, leads southerly by the store of Jeremiah Curtis, at Freedom village, instead of passing through the ravine, which is several rods northerly thereof, as did the road, which was discontinued.

The defendant admits the acts, which are the cause of this action, but justifies them under the authority of the town of Freedom, as one of its selectmen, insisting, that they were done to remove obstructions placed upon the bridge across the stream, which was upon the way as located by the County Commissioners. And it is understood, that the town of Freedom, in their corporate capacity, take the defence of this suit.

Juries having failed to agree upon a verdict in this case, on two trials, the parties agreed to submit the evidence adduced at the last trial to the Court, who are to apply the law thereto, and decide the whole as the law and the facts require.

The plaintiff introduced deeds, which show beyond controversy, that the road in question was established over land of which he was the owner at the time of the trespass complained of, and continued to be the owner up to the time of the last trial. The bridge upon which the alleged acts were done, was commenced in the year 1833, and completed in the year following, according to the testimony of James Lamson, called by the defendant.

It appearing, that the general title to the land, on which the bridge was constructed was in the plaintiff, the burden, to show that it was upon the location of the highway, as established by the County Commissioners, was upon the defendant. In taking this burden, he undertook to show by a

survey, that the bridge was upon the ground covered by the highway. And to repel the effect of this evidence, the plaintiff also introduced on his part, proof of a survey. Both surveys were *ex parte*, and each, in this attempt succeeded in his survey, in finding the location of the road, precisely in the place where he had contended that it was. The survey of each party was commenced at the east and proceeded to the west, to the junction of the Unity road.

In the original location of the highway, before any alteration was made, the course from Knox corner was north forty-five degrees west, eighty rods, thence west one hundred and eighty rods to the north line of Knox, to the stake and stones, thence on James Clement's land in Montville, north eighty-four degrees west, fifty-six rods to a hemlock tree, thence in Freedom on Robert Thompson's land, north seventy degrees west sixty rods to the stream. (It is conceded, that the last course was intended to be south seventy degrees west,) same course on James Pickard's land fifty rods to a stake and stones.

Upon the location just described, the defendant's surveyor attempted to find the point, from which the County Commissioners diverged, in making the change. To do this, he commenced at Knox corner and proceeded to trace the lines of the location adopted by the Court of Sessions; but few monuments were found, and the distance in some of the respective lines, on the different courses, was greater than that laid down in the record, the excess in some being from eight to ten rods; and in some, he had nothing but distance by which to correct the survey. And, sighting through the ravine, on the opposite side of the stream, was one mode resorted to, to correct the running, and to determine the point of divergence for the new road.

The surveyor of the plaintiff, endeavored to ascertain from the statements of persons, who had lived in the vicinity at the time the County Commissioners located the new road, and in other modes, the point at which he should commence, as the stake " R" on the line between James Clem-

ents and Henry Dodge, and by following the course there-from, with little or no variation, he came to the county road at the point claimed by the plaintiff as the termination of the line established as the southerly or easterly line of the highway; whereas by making the proper variation the line would have been still more unfavorable to the defendant.

Neither of these surveys can be regarded as conclusive, or, in fact, entitled to much confidence. The modes adopted by both surveyors to ascertain the eastern extremity of the line of the road established by the County Commissioners, is very unsatisfactory. It is difficult to perceive, in what manner a mathematical line can be ascertained, when it is sought wholly by sighting through a ravine, whose boundaries must be, from the nature thereof, very irregular, being at some points more distant from each other than at others, and the ravine itself probably varying materially in its course.

The starting point of the plaintiff's surveyor was dependent upon very uncertain evidence, of a character quite as well suited to mislead as otherwise, and that it was erroneous is very fully established by the fact, that it came out on the west side of the stream, as it did, without any variation being made in the line to meet the proved variation of the compass.

· The defendant also introduced evidence to show, that at the time the bridge was built, the maple bush marked as a monument, at the southern and western extremity of the line run for the road was standing, and that the bridge was made upon the location thereby indicated. Other natural and permanent objects were relied upon by the witnesses, existing near, as confirmatory of the opinion expressed, touching the point, where this monument stood. One of these objects was a high bluff ledge on the southerly side of the Unity road, opposite the marked maple bush, and there were appearances upon the ground in the vicinity of a more general character, pointed out by the witnesses, leading in their judgment to the same conclusion.

The effect of the evidence, just referred to, is in some

measure neutralized by the fact, that a maple tree, standing on the bank of the stream, and not far from the one marked as the monument of the location of the road, was also marked as the termination of a line run by a committee of the Court of Sessions, a year or two previous, that proved abortive, with which the monument in question might have been confounded; and also by the testimony of several witnesses, who knew of the maple bush, marked by the County Commissioners, at the time of the location of the road by them, and that it was near a ledge on the bank of the stream, some of the witnesses to these facts, stating that they were present at the time the tree was marked and knew the object intended, one of whom was Small, the only survivor of the County Commissioners, who laid out the road, and who testified expressly, that a maple bush was so marked by him, or his order, for a monument, and the place where it stood was selected as the termination of the line of the road, in order, that the ledge should be taken as a permanent foundation for the abutment of the bridge; and the ledge was recognized by him, in his testimony, and was so far below the bridge as built, that the bridge must have been entirely off the location of the road. It was also in evidence, that when the plaintiff moved his upper mill, which was afterwards destroyed by fire, from a spot above the bridge, to one below, a maple tree, marked, and in all respects corresponding with that made for a monument, was found, situated, in relation to the ledge, on the bank of the stream, as was that described by the witnesses who were present, when it was marked as a monument, or soon afterwards.

Several witnesses for the defendant, who lived near the bridge, testify generally, that they have no doubt it was placed on the highway as laid out; one of these witnesses is John True, who was appointed by the County Commissioners to superintend the opening of this road after its location. Witnesses, called by the plaintiff, express with equal strength of conviction a different opinion. It is proper to

state, that it appears by the testimony of the defendant's witnesses, that the true location of the road on the eastern side of the stream is quite as far to the south of that which was constructed as the road, as the true location of the road on the western side of the stream, contended for by the plaintiff, is north of the bridge; and that several dwellinghouses on the east side of the stream, and not far therefrom, erected since the location of the road, are upon the land which the defendant insists is covered by the highway.

The counsel for the defendant founds an argument of much apparent force and ingenuity upon the fact, not in dispute, that the plaintiff, on his own hypothesis, placed his upper mill in a permanent manner, upon the identical spot, which is a part of the public highway, and that he acquiesced in the location of the bridge without complaint for many years.

This conduct of the plaintiff, unexplained, would seem to indicate his opinion, that the bridge was located upon the highway. But it is shown, that the title to the land, over which it passed, was not in him, till after the bridge was completed, his deeds bearing date Jan. 9, 1835, and July 27, 1841. After he became interested, he may not have known, that the bridge was not on the highway, if such was the fact, or if he had such knowledge, his interest might not have induced him to disturb the state of things then existing. But after the controversy between him and the officers of the town commenced, he might have been influenced by other and less laudable motives; and it is quite manifest that under the litigation between the parties, each has been disposed to exact his extreme rights.

A question of fact raised by the evidence is in controversy. On the part of the plaintiff, it is insisted that by an arrangement among the citizens, residing within the surveyor's district, which embraced the bridge, and others, the bridge was actually built wholly at least on the easterly side of the line run by the County Commissioners, instead of the westerly side, as required by the record. Several

witnesses affirm this fact; and others, having apparently equal opportunity to know such a change, express an entire want of recollection of such arrangement. Among the former is the surveyor, who began the construction of the abutment for the bridge, on the west side of the stream, which abutment was completed the next year under the supervision of another surveyor. Of the latter, is the individual much interested, that the road should be changed from the ravine, so that the travel would pass his store. Both these witnesses have been gone a long time from the town of Freedom, and attempts were made to show, by statements made by them at different times, inconsistent with their testimony in the case, upon this point, that their recollection was obscured by time or other causes.

It is shown that a strong opposition was made to the change in the highway by the County Commissioners, who discontinued the road through the ravine, and it is insisted for the defendant, that the removal of the road as constructed the whole width of it at the bridge, would not have been attempted, in the face of the very men, who opposed the alteration in the highway itself. It is worthy of notice, that the opposition referred to, was to the change of the road, so that it should not pass up the ravine, and when that opposition had entirely failed, those who made it, would probably have the same interest with all others, to have the road made in the place which would be most convenient. But the testimony of John True, who testifies, that he was present at the location, and was one of the committee appointed by the Court afterwards, to open the road, and who, it is true, states, that he believes it was made on the location, is on the direct inquiry, " that the section of road and bridge, here referred to, was made by the Mills district, so called, and the surveyor by advice of citizens, and, I think, by parties concerned, made the travel and bridge up stream, or on the south side of the location, but I am quite confident, not over four rods, measuring at right angles, from the north line or monument, established by the Commissioners." And

in the cross-examination, he states, that the road and bridge, he believes, were at the request of citizens of Freedom, built a few rods up stream from the ledge on the west bank, but according to his best recollection, knowledge and belief, they were made within four rods of the stake or monument line, as run by the County Commissioners in fixing the location of the road. In a subsequent deposition, True adheres to his former statement, that the bridge and road were upon the up-stream side of the line run by the Commissioners. The testimony of this witness, called by the defendant, so interested in the location and construction of the road, admitted by all to be a man of intelligence and accuracy of recollection, and at the same time influenced by pure intentions, would seem to present an insurmountable obstacle to the establishment affirmatively of the defendant's proposition, that the bridge was built upon the highway as laid out by the Commissioners, unless shown to be given in a mistaken recollection of the facts. Such mistake is not proved to our satisfaction, though there is other evidence for the defendant, which if standing alone, might be sufficient, yet it is materially affected by evidence of the plaintiff, which is confirmed by that of True.

According to the agreement of the parties, —

*Defendant defaulted, and judgment for plaintiff* $1,00.